**FILED**
**May 7, 2018**
**7:33 AM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD
### (HEARD APRIL 26, 2018 AT KNOXVILLE)

| | |
|---|---|
| Shawn Ogden | ) Docket No.   2016-05-1093 |
| | ) |
| v. | ) State File No. 11323-2015 |
| | ) |
| McMinnville Tool and Die, Inc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Dale A. Tipps, Judge | ) |

---

**Affirmed and Certified as Final—Filed May 7, 2018**

---

The employee, a machinist, suffered injuries to his arm when he fell at work.  He subsequently developed complex regional pain syndrome for which the employer provided workers' compensation benefits.  After a spinal cord stimulator was surgically implanted into the employee's neck to address his symptoms, he developed leg weakness and pain and weakness in his neck.  While recovering from the surgery, the employee fell twice at home and was rendered a paraplegic.  The employer denied that the falls and resulting paralysis were causally related to the injury to the employee's arm.  The trial court found that the employee's falls and ensuing paralysis were a direct and natural consequence of his compensable work injury and that he was permanently and totally disabled.  The employer has appealed.  We affirm the trial court's decision and certify the court's order as final.

Presiding Judge Marshall L. Davidson, III, delivered the opinion of the Appeals Board in which Judge David F. Hensley and Judge Timothy W. Conner joined.

D. Brett Burrow, Nashville, Tennessee, for the employer-appellant, McMinnville Tool & Die, Inc.

John D. Drake, Murfreesboro, Tennessee, for the employee-appellee, Shawn Ogden

## Factual and Procedural Background

Shawn Ogden ("Employee"), a forty-six-year-old resident of Warren County, Tennessee, was employed as a machinist by McMinnville Tool & Die, Inc. ("Employer").

1

On February 12, 2015, Employee was walking around a machine at work when he tripped and fell, landing on his right arm. There is no dispute regarding Employee's arm injury, and Employer provided authorized medical care for that injury.

Employee developed complex regional pain syndrome ("CRPS") in his right arm, which caused him to experience severe pain and other symptoms. Medication provided minimal relief, and his authorized pain management physician, Dr. Jeffrey Hazlewood, recommended the use of a spinal cord stimulator. Dr. Hung Yu, a neurosurgeon, implanted the device into Employee's neck on August 31, 2016.

After the surgery, Employee experienced pain in his neck and had difficulty holding his head up properly. Dr. Yu explained that, because implantation of such a device requires the surgeon to cut through the muscles of the neck and shave off portions of the vertebrae, neck pain is an expected side effect of the surgery. Employee also experienced weakness in his right leg, which Dr. Yu stated was also a common side effect. Employee requested a cane as a result of his leg weakness, but he had not received it at the time of his falls.

After the spinal cord stimulator was implanted, Employee was able to do some chores around the house, such as loading the dishwasher, doing laundry, and cleaning the floors, consistent with Dr. Yu's instructions that he should be as active as possible.[1] However, despite being able to engage in some activities of daily living, Employee had significant impairment with his right arm and hand, which stayed in a drawn-up position to the point that his fingernails were digging into his palm.

On September 30, 2016, approximately four weeks after his surgery, Employee was home alone when he began experiencing severe neck pain and was unable to hold his head up. Believing that he was experiencing a medical emergency and that he needed to get to a hospital, Employee attempted to navigate three stairs from his house into an attached garage to reach his cell phone to call his girlfriend for help.[2] Given the condition of his right arm, Employee was unable to use the handrail beside the steps. Employee testified he took the steps one at a time, placing his right foot on a step, then bringing his left foot down to the same step before proceeding. When he reached the bottom step, his right knee buckled and he fell, landing on the step on his buttocks and

---

[1] According to Dr. Yu, "we definitely encourage mobility [following surgery], . . . it's good to walk around. Otherwise, it's going to be harder to walk around and your balance is going to be off, your function is going to be lower."

[2] Employee had a landline telephone in his home. However, he testified that his girlfriend's phone number was stored in his cell phone and that he did not have it memorized. Further, Employee's girlfriend testified that when she attempted to call 911 from the home phone, she "couldn't get that thing to work. We had just gotten it with the cable and it was not working correctly." Ultimately, she called 911 from Employee's cell phone.

2

hitting his head on the wall next to the steps. He denied experiencing any previous difficulties going down the stairs into the garage, which he did on a frequent basis.[3]

After Employee fell, he crawled to retrieve his cell phone and then crawled back into the house where he called his girlfriend. He tried to stand up again but, having lost feeling and control of his legs, he fell back down, landing again on his buttocks. He was able to pull himself into a chair to wait for his girlfriend.

Upon her arrival home, Employee's girlfriend found him sitting in a chair unable to hold his head up or move his legs. She called 911 and Employee was taken by ambulance to Unity Medical Center ("Unity"). The hospital's records reflect "ct [of the] head wasn't done because [Employee] had no [loss of consciousness]." Employee's paralysis prompted Unity to have him airlifted to Vanderbilt University Medical Center ("Vanderbilt") where he underwent another surgery, this time to remove the spinal cord stimulator.

The records of Air Evac, the company that transported Employee to Vanderbilt, reflect that he suffered two episodes of syncope. Upon arrival at Vanderbilt, the attending medical provider noted that "as per EMS, the patient had two episodes of syncope."[4] Employee testified, however, that he never reported experiencing syncope but that his right leg gave way when he was on the bottom step going into the garage, causing him to fall and hit his head. Employee's girlfriend testified that she never told any medical care provider that Employee passed out. She further testified that she was present during Employee's conversations with EMS, Unity, and Air Evac personnel and that he never indicated he had passed out.

Employee's surgeon, Dr. Yu, stated in an affidavit that a "frequent complication of the implantation of spinal cord stimulators . . . is weakness and instability in the lower extremities during the recovery period." She believed that "such weakness is likely the cause of [Employee] falling in his home and receiving injuries to his spine from which he now suffers." Dr. Yu opined that Employee's "falls of October 1, 2016, resulted from the transient expected post-operative weakness associated with the spinal cord stimulator surgery on or about August 31, 2016."[5] According to Dr. Yu, it was "more likely than not his current condition is related to his initial injury to his right upper extremity which arose during the course and scope of his employment with [Employer.]"

---

[3] At the time of the fall, Employee's phone was charging in his garage where he often spent time watching television and smoking cigarettes.

[4] We assume the reference to EMS is a reference to Air Evac. The EMS records from the ambulance service that transported Employee from his home to Unity do not reflect any report of loss of consciousness.

[5] The date of injury is identified as October 1, 2016 because it was after midnight when Employee fell.

Dr. Yu also explained that Employee had no medical restrictions against using stairs, though she agreed that if Employee failed to "take appropriate precautions of maneuvering from one place to another especially as it pertains to steps, . . . it was either imprudent, ill-advised or a neglect aspect." She agreed Employee should have been aware that his instability placed him at a greater risk of falling. She also stated that she accepted Employee's statements regarding whether he had syncopal episodes as true, finding no evidence that such an episode occurred or contributed to his injuries. Ultimately, Dr. Yu reiterated her opinion that Employee's "fall was the result of a chain of unfortunate events that was set off by . . . the implant of the spinal cord stimulator."

Employer denied the compensability of Employee's falls and the resulting complications, including his paraplegia. Employer's position was twofold: (1) Employee's use of the stairs was negligent and, thus, constituted an independent intervening cause of his injuries, breaking the chain of causation; and (2) Employee's falls resulted from episodes of syncope related to a pre-existing heart condition, breaking the chain of causation.[6]

Following a trial, the court concluded there was insufficient medical proof to establish Employee suffered episodes of syncope on the day of his falls. Furthermore, the trial court found that Employee's use of the stairs going into his garage was not negligent conduct or an independent intervening event sufficient to break the chain of causation. Lastly, the trial court concluded there was no evidence that navigating the stairs is what caused Employee to fall. As a result, the trial court determined Employee's falls and resulting medical conditions were a direct and natural consequence of the work injury, and it awarded Employee permanent total disability benefits and future medical benefits. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2017). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and

---

[6] It is undisputed that Employee had pre-existing heart problems, including having undergone a quadruple coronary bypass a number of years prior to the work accident. However, he denied ever suffering syncope as a result of his heart disease, and he denied having received any regular treatment for his heart disease in recent years. He had been cleared for the surgical implantation of the spinal cord stimulator from a cardiac standpoint.

application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2017).

## Analysis

Employer raises a single issue for our review, i.e., whether the trial court erred by finding Employee's October 1, 2016 falls were the direct and natural consequence of his prior compensable arm injury. Discerning no error, we affirm the trial court's decision.[7]

### A.

Initially, we note that Employee cites Tennessee Code Annotated section § 50-6-217(a)(3) (2016) (repealed 2017) in support of his argument that the trial court's decision should be affirmed. Section 50-6-217(a)(3) authorized us to reverse or modify a trial court's decision if the rights of a party were prejudiced because the findings of the trial judge were "not supported by evidence that is both substantial and material in light of the entire record." However, as we have pointed out on numerous occasions, this code section was repealed effective May 9, 2017.[8] Consequently, as noted above, the standard we apply in reviewing the trial court's decision presumes that the trial judge's factual findings are correct unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-239(c)(7).

---

[7] At trial, Employer argued that Employee fell because he suffered episodes of syncope related to his pre-existing heart disease, thus rendering the falls and resulting complications noncompensable. On appeal, Employer does not dispute the trial court's conclusion that there is insufficient medical proof to establish Employee suffered episodes of syncope. Accordingly, we do not address that aspect of the case.

[8] *See, e.g.*, *Edwards v. Fred's Pharmacy*, No. 2017-06-0526, 2018 TN Wrk. Comp. App. Bd. LEXIS 9, at *5-6 (Tenn. Workers' Comp. App. Bd. Feb. 14, 2018); *Bowlin v. Servall, LLC*, No. 2017-07-0224, 2018-TN Wrk. Comp. App. Bd. LEXIS 6, at *6-7 (Tenn. Workers' Comp. App. Bd. Feb. 8, 2018); *Thompson v. Comcast Corp.*, No. 2017-05-0639, 2018 TN Wrk. Comp. App. Bd. LEXIS 1, at *12-13 (Tenn. Workers' Comp. App. Bd. Jan. 30, 2018); *Baker v. Electrolux*, No. 2017-06-0070, 2017 TN Wrk. Comp. App. Bd. LEXIS 65, at *5-6 (Tenn. Workers' Comp. App. Bd. Oct. 20, 2017); *Butler v. AAA Cooper Transportation*, No. 2016-07-0459, 2017 TN Wrk. Comp. App. Bd. LEXIS 54, at *5-6 (Tenn. Workers' Comp. App. Bd. Sept. 12, 2017); *Glasgow v. 31-W Insulation Co., Inc.*, No. 2017-05-0225, 2017 TN Wrk. Comp. App. Bd. LEXIS 51, at *11-12 (Tenn. Workers' Comp. App. Bd. Sept. 6, 2017).

Turning to the merits of this appeal, we note the general rule in Tennessee that a "subsequent injury, whether in the form of an aggravation of the original injury or a new and distinct injury, is compensable if it is the 'direct and natural result' of a compensable injury." *Anderson v. Westfield Grp.*, 259 S.W.3d 690, 696 (Tenn. 2008). The rule, commonly referred to as the direct and natural consequences rule, has been described as follows: "[w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment." *Id.* at 696-97. Therefore, "all the medical consequences and sequelae that flow from the primary injury are compensable." *Rogers v. Shaw*, 813 S.W.2d 397, 400 (Tenn. 1991). "The rationale for the rule is that the original compensable injury is deemed the cause of the damage flowing from the subsequent injury-producing event." *Anderson*, 259 S.W.3d at 697.

On the other hand, the law is also clear that "[h]owever firmly implanted the principle may be that a subsequent injury is deemed to arise out of the employment if it flows from a compensable injury, the rule has a limit. That limit hinges on whether the subsequent injury is the result of independent intervening causes, such as the employee's own conduct." *Id.* Tennessee courts have consistently applied the principle that, in order for an employee's actions to constitute an independent intervening incident sufficient to break the chain of causation, there must be negligent, reckless, or intentional conduct on the part of the employee. *Id.* at 698.

In this case, Employer contends that Employee's decision to navigate the stairs to his garage in the manner he did was negligent and, as such, constitutes an independent intervening cause. According to Employer, Employee's behavior created such a substantial risk that Employer should not have to bear the resulting consequences. Employer relies on *Bolden v. Lowe's Home Centers, Inc.*, No. 2016-05-1033, 2017 TN Wrk. Comp. App. Bd. LEXIS 28 (Tenn. Workers' Comp. App. Bd. Apr. 21, 2017), in which an injured worker, while recovering from an ankle injury, went hiking in the Rocky Mountains and crossed a river by using his injured foot as a "springboard" to push from one boulder to another, causing additional injury to his ankle. We rejected the employee's assertion that his subsequent injury was causally related to his work injury, observing that the employee "voluntarily engaged in non-work-related physical activities that presented a substantial risk to his healing left ankle and resulted in an aggravation or re-injury that required additional medical treatment." *Id.* at *9.

Although Employer in the present case couches the issue as whether Employee's behavior was a "substantial risk" as set out in our conclusion in *Bolden*, the relevant inquiry remains, as it did in that case, whether Employee exercised reasonable care under the circumstances. *See Anderson*, 259 S.W.3d at 698 (an employee acts negligently when the employee fails to exercise reasonable care under the circumstances). It is true, as

Employer points out, that Employee knew he suffered from weakness in his legs and was at risk of falling while recovering from his surgery. It is also true that Dr. Yu, the authorized physician, testified that Employee should have been aware of the risk of falling and should have taken appropriate precautions.

However, it is also undisputed that Employee was under no medical restrictions with respect to walking or navigating stairs. Rather, he had been instructed to be as active as possible to facilitate his recovery. Moreover, he had gone up and down the stairs numerous times since his surgery, as well as a matching set of stairs on the other side of his house, without incident. In fact, he had gone up and down the stairs numerous times on the day he fell.

In addition, when questioned regarding the manner in which he navigated the stairs, the following exchange occurred:

Q:      . . . When you put one foot down, would you bring the second foot down to the same stair?

A:      Yes.

Q:      And then once you got both feet on one stair, you put the next foot down to the next stair --

A:      Exactly.

Q:      -- and bring your second foot down to that stair?

A:      Exactly.

Thus, this is not a situation where Employee disregarded all caution and bounded down the stairs. To the contrary, he deliberately walked down each one, placing both feet on each step, despite the urgency of the situation.

Furthermore, at the time of the fall, Employee believed he was experiencing a medical emergency, and he was going down the stairs to retrieve his cell phone so he could call his girlfriend to take him to the hospital. While it is undisputed that Employee had access to a telephone inside the house, it is also undisputed that he did not have his girlfriend's number memorized. Moreover, there is uncontradicted testimony from his girlfriend that the home phone was not working correctly.

Given these circumstances, we cannot conclude that the trial court erred in its determination that Employee's decision to navigate three stairs, which he had done several times that day, was not negligent. Employee believed his condition was such that

he needed to get to a hospital, and he had to get down the stairs to reach his phone. The record contains no suggestion that Employee's belief was unreasonable. By contrast, the employee in *Bolden* was pushing off rocks while hiking in the Rocky Mountains, using his injured foot as a "springboard" to go from one rock to another. *Bolden*, 2017 TN Wrk. Comp. App. Bd. LEXIS 28, at *5. The two cases are dissimilar, and Employer's reliance on *Bolden* is misplaced.[9]

Finally, Employer argued at trial that Employee should have used the handrail on the right side of the stairs to prevent a fall. However, it is undisputed that he had significant limitations with his right arm and that his hand was clawed as a result of the CRPS, rendering his right arm minimally useful. Employer suggested at trial and at oral argument before us that Employee could have reached across his body to grasp the railing with his left hand or could have gone down the stairs backward so he could use his left hand. However, it is not difficult to imagine Employee's leg weakness and instability would have rendered these actions equally risky, if not more so, due to awkward positioning. Moreover, we are not convinced that such actions would have been any more or less reasonable than the manner in which Employee attempted to navigate the steps.

In short, the evidence supports the trial court's finding that Employee, who was recovering from spinal surgery, did not act unreasonably by attempting to retrieve his phone to seek help for what he believed was a medical emergency.

### C.

In addition to finding that Employee was not negligent in deciding to navigate the stairs to access his phone to seek assistance, the trial court concluded there was no evidence to establish that going down the stairs is what caused Employee to fall. Employer argues that this issue was addressed by a stipulation between the parties that Employee "fell down his steps and sustained an additional injury." Employer asserts that, given this stipulation, the trial court "had to either accept the causal connection between the injury and falling form [sic] the bottom step . . . or remand the case . . . for the parties to develop this issue further." We disagree.

As noted by the trial court, without any proof the steps caused Employee's leg to buckle and precipitate the fall, it cannot be said that his use of the steps was an independent intervening cause. Employer presented no evidence that the steps caused

---

[9] The circumstances of the present case are analogous to those in *Carpenter v. Lear-Siegler Seating Corp.*, No. 03501-9201-CV-5, 1993 Tenn. LEXIS 67 (Tenn. 1993). In *Carpenter*, the employee suffered a back injury and reported experiencing unpredictable intermittent numbness in her leg as a result. *Id.* at *2. She alleged that an episode of this numbness caused her to fall down stairs at her home, resulting in additional injuries. *Id.* at *1. The Tennessee Supreme Court found a causal connection between the back injury and the resulting fall and determined the injuries sustained in the fall were compensable. *Id.* at *7.

Employee to fall. Instead, the only evidence regarding the cause of the fall was Employee's testimony that he fell because his leg gave way. The trial court correctly observed that "[t]his was the result of postoperative weakness, not the use of the steps." Indeed, Employee described experiencing a similar episode of weakness in his leg while walking on the level floor in his house after he got his phone and fell a second time. There is simply no proof that the steps themselves had any impact on whether the fall occurred or the severity of the injuries, and we decline to speculate either way.

Furthermore, the stipulation upon which Employer relies contains no language establishing a causal connection between Employee's use of the stairs and his fall. Rather, the stipulation recites a portion of the sequence of events that resulted in Employee's paralysis, and a generous reading of it can infer a causal connection between the fall and the injuries. In fact, there is no dispute that the fall caused Employee's additional injuries. However, there is no evidence that the stairs, rather than Employee's post-operative weakness, caused the fall, and the stipulation upon which Employer bases its argument is silent on that issue.

In sum, Employee's decision to walk down the three stairs to reach his phone and seek help did not rise to the level of negligent behavior such that the chain of causation between his compensable injury and his paralysis from falling was broken. The authorized physician opined that the falls were the result of the implantation of the spinal cord stimulator, which was made necessary by the work-related arm injury. And finally, there is no evidence that going down the stairs caused Employee to fall. To the contrary, his leg gave out while he happened to be on the bottom step, just as it did a short time later when he was not on the stairs. Accordingly, we conclude, as the trial court did, that the falls were the direct and natural consequence of the work-related injury and the resulting additional injuries are compensable.

## Conclusion

For the foregoing reasons, we hold that the evidence does not preponderate against the trial court's decision. Thus, the trial court's decision is affirmed, and the court's order is certified as final.

9